ZA:TAD/AS
F.# 2014R01932

**15M358**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

PETER PERSAUD,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT
SUPPORT OF APPLICATION
FOR ARREST WARRANT

(T. 18, U.S.C. §§ 1028A, 1029
 and 1344)

RYAN MCCABE, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

Upon information and belief, there is probable cause to believe that in or about and between January 2014 and April 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant PETER PERSAUD did knowingly and intentionally: (1) execute and attempt to execute a scheme and artifice to defraud a financial institution, contrary to Title 18, United States Code, Section 1344; (2) with intent to defraud, traffic in and use one or more unauthorized access devices within any one one-year period, and by such conduct obtain anything of value aggregating $1,000 or more during that period, contrary to Title 18, United States Code, Section 1029(a)(2); and (3) transfer and possess a means of identification of another person during and in relation to

the commission of bank fraud and access device fraud, without lawful authority, in violation of Title 18, United States Code, Section 1028A.

(Title 18, United States Code, Sections 1028A, 1029 and 1344.)

The source of my information and the grounds for my belief are as follows:[1]

1. I have been employed as a Special Agent with the FBI since June 2014 and am currently assigned to squad CY-6, a financial cybercrimes task force. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for white collar crimes, cybercrimes, and other related crimes. These investigations are conducted both in an undercover and overt capacity. While working for the FBI, I have participated in numerous investigations of white collar crimes, narcotics violations and crimes against children. During the course of these investigations, I have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, and reviews of taped conversations and financial records.

2. I am familiar with the information contained in this affidavit based on my personal participation in the investigation, my review of documents, my training and experience, and my discussions with other law enforcement personnel concerning the investigation. The statements contained in this affidavit are based on my own observations

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all of the relevant facts and circumstances of which I am aware.

2

and review of documents, or reliable information provided to me by other law enforcement personnel.

### The Fraudulent Scheme

3. The defendant, PETER PERSAUD, was until recently an employee of JP Morgan Chase Bank ("Chase"),[2] who was involved in a scheme to defraud the bank's customers and the bank itself by stealing customer account information and using it to make unauthorized withdrawals from customer accounts. Over the course of the investigation, PERSAUD has sold Chase bank account information to an undercover officer and a confidential informant.

4. In or about November 2014, a confidential informant ("CI #1")[3] told the FBI, in sum and substance, that he/she had been contacted by PERSAUD concerning a scheme wherein PERSAUD would provide the identifying information and account information for Chase customers, to fraudulently withdraw money from customer accounts. In early November 2014, PERSAUD telephoned CI #1 and instructed him/her to meet PERSAUD at the Chase branch in Brooklyn where PERSAUD worked. At this meeting,

---

[2] Chase's deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").

[3] CI #1 is a paid confidential informant who has been working for the FBI for approximately five months. CI #1 has multiple pending criminal charges in state court. CI #1 is cooperating solely for pay and has no pending federal criminal charges. During the course of his/her cooperation with the FBI, CI #1's information has repeatedly been corroborated by independent evidence, including consensually recorded telephone calls, consensually recorded meetings, surveillance, and documents obtained from third parties.

3

PERSAUD gave CI #1 two pieces of paper containing Chase account information and multiple means of identification for VICTIM 1, an individual whose identity is known to me. The information included: VICTIM 1's address, social security number, date of birth, Chase debit card number, its expiration date and security code, and the associated bank account number.[4] PERSAUD instructed CI #1 to go to a check cashing store located in Corona, New York, to retrieve a wire transfer from VICTIM 1's Chase account in the amount of approximately $2,500. PERSAUD informed CI #1 that he/she needed all of the account and identifying information for VICTIM 1 that PERSAUD previously had given CI #1 to retrieve the wire transfer at the check cashing store. Following PERSAUD's directions, CI #1 went to the check cashing store in Corona and picked up the $2,500 that had been wire transferred from VICTIM 1's Chase account. Records obtained from Western Union confirm that on November 5, 2014, $2,500 was wired from VICTIM 1's Chase account to a Pay-O-Matic check cashing store in Corona, Queens, and that the money was picked up CI #1 on November 9, 2014. CI #1 later delivered the money to PERSAUD. CI #1 and PERSAUD agreed that CI #1 would thereafter pick up a number of similar wire transfers, at which point PERSAUD would pay CI #1 approximately $5,000.

     5.    CI #1 conducted the above-described transaction with PERSAUD before becoming a confidential informant for the FBI and was not acting at the direction of

---

[4] Records obtained from Chase show that on or about November 4, 2015, PERSAUD accessed VICTIM 1's account information using Chase's computer system.

4

or under the supervision of the FBI. The FBI has corroborated many of the details of this transaction through information obtained by subpoena, including documents obtained from Western Union, Chase, and telephone records.

6.  On or about December 17, 2014, at the direction and under the supervision of the FBI, CI #1 met with PERSAUD at the Chase branch in Brooklyn where PERSAUD worked. FBI agents conducted surveillance of the meeting, and CI #1 was wearing a concealed recording device. Prior to the meeting, agents confirmed that CI #1 possessed no contraband or weapons; agents also provided CI #1 with $2,500 to be used to purchase account information and a means of identification for VICTIM 2, a person whose identity is known to me. After meeting PERSAUD inside the bank, CI #1 and PERSAUD exited the bank, walked to the parking lot and entered PERSAUD's vehicle: a white Lexus SUV. During the meeting, PERSAUD gave CI #1 a piece of paper containing Chase account information and multiple means of identification for VICTIM 2. The piece of paper included: VICTIM 2's name, current and former address, social security number, date of birth, Chase debit card number, and the expiration date of VICTIM 2's Chase debit card. After receiving the information, CI #1 gave PERSAUD $2,500. During the meeting, PERSAUD told CI #1, in sum and substance, that there was approximately $19,000 in VICTIM 2's account, and the account had a $3,000 daily withdrawal limit. PERSAUD told CI #1 that he/she could pay PERSAUD the remaining $7,500 for a total of $10,000, after CI

#1 had emptied the account.[5] After the meeting, FBI agents retrieved from CI #1 the recording device and the piece of paper PERSAUD had given him/her, and confirmed that CI #1 had no money on his/her person that he/she did not have prior to the meeting (apart from the $2,500, which CI #1 no longer had). Records obtained from Chase show that at the time PERSAUD gave VICTIM 2's account information to CI #1, VICTIM 2's checking account had a balance of $19,865.55.[6]

7. Later that same day, at the direction and under the supervision of FBI agents, CI #1 spoke to PERSAUD and informed PERSAUD that VICTIM 2's bank account number was missing from the piece of paper PERSAUD had provided. PERSAUD told CI #1 the account number and routing number during a recorded telephone conversation. The account number and routing number PERSAUD provided matches information received from Chase concerning VICTIM 2's account.

8. On or about December 20, 2014, CI #1 and PERSAUD corresponded via text message concerning VICTIM 2's information. PERSAUD's text messages originated from a telephone number ending in -8908, whose wireless provider is T-Mobile, and which is registered to PERSAUD at his home address of record (the "8908 number").

---

[5] PERSAUD and CI #1 previously had agreed that CI #1 would pay PERSAUD one half of the value of the account in exchange for the account information PERSAUD gave CI #1, which would permit CI #1 to drain the account.

[6] Neither CI #1 nor the FBI withdrew money from any of the victims' accounts during the time period when CI #1 was working at the direction and under the supervision of the FBI.

The text message conversation, which I viewed on CI #1's telephone and confirmed through phone records, went as follows:

| | |
|---|---|
| PERSAUD: | Wat u c the pin add |
| CI #1 : | 40-- [last two numbers redacted] |
| PERSAUD: | Nahh 44-- [last two numbers redacted] |
| CI #1: | Ok |
| PERSAUD: | [Sends photograph of paper containing account information for VICTIM 2] |
| CI #1: | Better |
| PERSAUD: | Yo [CI #1 name redacted] how much more im seein off this 2 |
| PERSAUD: | 1* |
| PERSAUD: | Cuz he got 19 k in there |
| CI #1: | Im trying |
| CI #1: | Give me a min |
| CI #1 | Yo whats the three digit |
| CI #1: | Code |
| PERSAUD: | N---- we need this shit to b more efficent |
| PERSAUD: | Im tired of all this bak n forth the nex 1 we get let it b on yhe money rite |
| CI #1: | Iight |
| CI #1: | You sure that 499 is the three digit |
| PERSAUD: | Yea bro |

7

    PERSAUD:    I gave him that card

    PERSAUD:    Y u ask

9. Based on my training, experience and knowledge of the investigation, in the above text message exchange, PERSAUD confirmed the pin number associated with VICTIM 2's bank account and sent a photograph of a piece of paper containing, among other things, VICTIM 2's name, address, birth date, social security number and Chase account number. PERSAUD also confirmed the total amount of money in VICTIM 2's account and attempted to confirm the amount of money he would be receiving from CI #1: "1*," i.e., $10,000.

10. On or about December 30, 2014, PERSAUD AND CI #1 spoke by telephone over the 8908 number. During this recorded conversation, PERSAUD and CI #1 discussed obtaining information for another Chase customer account:

    CI #1:    Yo

    PERSAUD:    Yo, what's good bro?

    CI #1:    Ain't shit, n----. I was trying to get ahold of you all day earlier.

    PERSAUD:    Oh yeah, no I was looking at my phone all the – what the hell?

. . .

    CI#1:    It ain't shit. Yo, what's up, um, you got anything locked up?

    PERSAUD:    Nah, nah, no I'm still working on them, bro. It's hard to get the PIN, man…

    CI #1:    I … nah, I don't need the PIN, that's the thing. That's extra.

8

| | |
|---|---|
| PERSAUD: | What you need? |
| CI #1: | I just need the regular rundown. |
| PERSAUD: | See and you ... you ain't telling me shit, n----. |
| CI #1: | No because I tried to talk... |
| PERSAUD: | You gotta tell me shit. |
| CI #1: | Also, I had to tell you the last time. Alright, listen, I don't need the PIN. Just get me the run down how you got it to me the last time. Fuck the PINs...make sure the expiration date is there, everything is there. Alright so (U/I)... |
| PERSAUD: | The security code. |
| CI #1: | And um, yeah, the security code, that's it. I need first name, last name, address, social, um, where they live at, and that's it. Where they live at and basically they they they bio, that's it. |
| PERSAUD: | So the same shit I gave you last time, just not the PIN? |
| CI #1: | Just not the PIN. I don't need none of that, 'cause tomorrow. You know I was gonna come see you today. N----s have bread for you today. |
| PERSAUD: | N----, you should have told me you only need that. Yo, you not talking to me, n----. I told you the next time... |
| CI #1: | Bro, alright listen....listen, this is sufficient right now. This is what I'm telling you I need, and this is what my son needs, alright? |
| PERSAUD: | Alright. |
| CI #1: | I'm telling you, the n---- need first and last name, ID numbers, alright, and he just basically, just the same shit you got me for [victim name redacted]. |
| PERSAUD: | Got you. |
| CI #1: | Just the same shit. Nothing, nothing left, nothing extra. You |

9

>    could have some for me tomorrow if you can…I got some bread locked up for you today. And I know n----s still owe you from last time, so I still got you.
>
> PERSAUD:   Ah, um, the only thing is now that I know that, it's gonna be easier, you know what I'm saying? If you had told me that, I'd have been at shit for you… But um, now I just gotta work on um, and see I could go in and get some shit, but the only thing is, um, I'm not gonna have the security code. I need that, you know what I'm saying, so I, I have to personally touch somebody and give them or see they shit to get that, so work with me. If I get something tomorrow, I'm gonna hit you up.

. . .

11.   The next day—December 31, 2014—at the direction and under the supervision of FBI agents, CI #1 met PERSAUD at the Chase branch in Brooklyn where PERSAUD worked. This meeting was recorded, and FBI agents conducted surveillance. PERSAUD provided CI #1 a piece of paper that contained all the account information necessary to empty the Chase account of VICTIM 3, an individual whose identity is known to me. In return, CI #1 paid PERSAUD $2,500, which had been provided by the FBI. PERSAUD told CI #1 that VICTIM 3's Chase account contained approximately $15,000. Records obtained from Chase confirm that as of December 31, 2014, VICTIM 3's Chase checking account balance was $16,470.10. After the meeting was over, FBI agents met with CI #1, retrieved the recording device and the piece of paper PERSAUD had given CI #1. The agents also confirmed that CI #1 had no money on his/her person that he/she did not have prior to the meeting (apart from the $2,500, which CI #1 no longer had). The piece of paper retrieved from CI #1 contained VICTIM 3's name, address, social security number,

10

date of birth, Chase debit card number, the date the card was issued, security code, and the card's expiration date.

12.     PERSAUD and CI #1 continued to communicate from late December 2014 through mid-January 2015. On or about January 14, 2015, at the direction and under the supervision of FBI agents, CI #1 met PERSAUD. This meeting was recorded while FBI agents conducted surveillance. At the meeting, CI #1 introduced an undercover FBI agent ("UC") to PERSAUD, under the guise that the UC was the person who had been giving CI #1 the money to purchase account information from PERSAUD. At the meeting, the UC paid PERSAUD $3,500. In exchange, PERSAUD gave the UC account information for two Chase accounts for VICTIM 4 and VICTIM 5, two individuals whose identities are known to me. PERSAUD explained that VICTIM 4's Chase account contained approximately $18,000, and VICTIM 5's Chase account contained approximately $3,800. Records received from Chase confirm that the accounts at issue had balances of $18,537.98 and $3,743.28, respectively.

13.     During the January 14, 2015 meeting, PERSAUD told CI #1 and the UC that he was planning on using other people to access customer accounts so he could avoid detection by Chase:

> I gotta take it easy though 'cause them sayin' if shit go down, right, and them n----- look at everybody shit hat got hit they be like what's this one thing that similar in everybody account? What's gonna pop up? My mother-fuckin' name, alright so I'm a see if I can get somebody else that could look up some shit too and I ain't gonna put them on to y'all you're gonna deal with me

11

and I'm just gonna bring everything to y'all.

14. On or about January 28, 2015, the UC and PERSAUD met in the vicinity of the Chase branch where PERSAUD worked. Before this meeting, the UC and PERSAUD spoke about the bank account information that PERSAUD would be providing. At the meeting, which was recorded, the UC purchased from PERSAUD additional bank account information and personal identifying information for VICTIM 6, a person whose identity is known to me. PERSAUD estimated that the account contained about $180,000. Records obtained from Chase confirmed that VICTIM 6's Chase account had a total value at the time of $181,252.88.

15. During the January 28, 2015 meeting, PERSAUD indicated he could sell additional accounts, depending on when he would be meeting with his bank clients. PERSAUD stated: "I could definitely get it, it's just the timing on the part. . . . It's, 'cause it's not like oh, I'm just going and getting it. It's whoever comes sit with me, I got to have a reason to be in that fucking account."

16. On February 17, 2015, PERSAUD and the UC spoke on the telephone. During this call, which was recorded, PERSAUD stated, in sum and substance, that he had two Chase customer accounts for sale. One account contained approximately $14,000, and the other contained approximately $36,000. PERSAUD agreed to sell the UC identifying information for both accounts, including the relevant account numbers, for $4,500.00. The UC and PERSAUD agreed to meet the following Tuesday, i.e., February 24, 2015.

Ultimately, this meeting did not take place because Chase suspended PERSAUD on February 20, 2015.

17.  On February 23, 2015, PERSAUD informed the UC during a recorded conversation that he had been suspended by Chase, and, as a result, PERSAUD would temporarily be unable to sell additional accounts. PERSAUD stated: "Nah, I can't get nothing while I'm suspended. 'Cause I don't have access to that shit."

18.  From early to mid-March 2015, PERSAUD spoke to the UC via telephone three times. These calls were recorded. During the conversations, PERSAUD represented that he was no longer suspended from Chase and that he was seeking to sell identifying information for four Chase accounts, which contained a total of approximately $150,000. PERSAUD offered to sell the accounts for approximately $16,000.00 to $17,000.

## CONCLUSION

19.  Based on the facts set forth in this affidavit, there is probable cause to believe that PETER PERSAUD did knowingly and intentionally: (1) execute and attempt to execute a scheme and artifice to defraud a financial institution, contrary to Title 18, United States Code, Section 1344; (2) with intent to defraud, traffic in and use one or more unauthorized access device within any one one-year period, and by such conduct obtain anything of value aggregating $1,000 or more during that period, contrary to Title 18, United States Code, Section 1029(a)(2); and (3) transfer and possess a means of identification of

another person during and in relation to the commission of bank fraud and access device fraud, without lawful authority, in violation of Title 18, United States Code, Section 1028A.

20. It is respectfully requested that this Court issue and order sealing, until further order of the Court, all papers submitted in support of this application, including the application, the arrest warrant, and the complaint. I believe that sealing these documents is necessary because the defendant is currently at liberty. For this reason, the government seeks to seal the complaint and arrest warrant to ensure that the defendant does not learn that a complaint has been filed and an arrest warrant has been issued, and to prevent him from fleeing justice and avoiding arrest and prosecution.

WHEREFORE, I respectfully request that the Court issue an arrest warrant and that the defendant PETER PERSAUD be dealt with according to law.

RYAN MCCABE
Special Agent
Federal Bureau of Investigation

Sworn to before me this
20th day of April, 2015

THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK